## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **8:12CR30** |
| | ) | |
| vs. | ) | **FINDINGS AND** |
| | ) | **RECOMMENDATION** |
| **JONY VALENCIA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the court on the Motion to Suppress Evidence and Statements filed by the defendant Jony Valencia (Valencia) (Filing No. 41).  Valencia is charged in the Indictment with a conspiracy to possess with intent to distribute 500 grams or more of methamphetamine (Count I), in violation of 21 U.S.C. § 846, and possession with intent to distribute 500 grams or more of methamphetamine (Count II), in violation of 21 U.S.C. § 841(a)(1) and (b)(1).  **See** Filing No. 27.  Valencia seeks to suppress all statements and evidence obtained by law enforcement following a traffic stop on December 14, 2011.  **See** Filing No. 41 - Motion.  Valencia argues there was no probable cause for the stop, the length of detention was unreasonable, and he did not consent to the vehicle search.  **See** Filing No. 42 - Brief.  Additionally, Valencia argues he was the only proper party to give consent to the vehicle search.  **See** Filing No. 49 - Reply.

On May 24, 2012, the court held a hearing on the motion.  Valencia was present with his retained counsel, Joshua W. Weir.  Assistant U.S. Attorney David M. Wear represented the United States.  During the hearing, the court heard testimony from Valencia and Butler County Sheriff's Department deputies Marcus Siebken (Deputy Siebken) and Shawn Gray (Deputy Gray).  The court also received into evidence a video disk of the traffic stop (Exhibit 1), Deputy Siebken's certifications (Exhibit 2), and a vehicle registration and receipt (Exhibit 3).  A transcript (TR.) of the hearing was filed on June 4, 2012, upon which the motion was deemed submitted.  **See** Filing No. 55.

**FINDINGS OF FACT**

On December 14, 2011, at approximately 11:30 p.m., Deputy Siebken conducted a traffic stop of a 2005 Ford Taurus for speeding on Highway 92 traveling eastbound in Butler County (TR. 38-39; Ex. 3). Deputy Siebken was driving westbound on Highway 92 when he observed the 2005 Ford Taurus traveling above the 60 mile per hour speed limit (TR. 28-29; Ex. 3). Deputy Siebken conducted a radar test and determined the vehicle was traveling at 72 miles per hour (TR. 38). Deputy Siebken activated his emergency lights and the Ford Taurus pulled to a stop at the side of the highway (TR. 39, 42). Deputy Siebken walked to the driver's side of the vehicle (TR. 39, 42). Deputy Siebken observed a strong odor of air freshener, which concerned him based on his experience and training (TR. 43). Deputy Siebken asked the driver, Maria Manzo (Manzo), for identification documents for both Manzo and the passenger, Valencia, vehicle registration, and insurance documents (TR. 40). Manzo presented a California driver's license and Valencia presented a Washington driver's license (TR. 40). Deputy Siebken explained he pulled the vehicle over for a speeding infraction and requested Manzo to accompany him to his cruiser to fill out paperwork (TR. 41). Manzo did not have any difficulty understanding Deputy Siebken (TR. 58). Manzo did not appear to be under the influence of drugs or alcohol at the time (TR. 59).

While in the cruiser, Deputy Siebken asked Manzo questions about ownership of the vehicle, about Manzo and Valencia, and their travel itinerary (TR. 46). Manzo said the vehicle belonged to Valencia's aunt who gave Valencia permission to borrow the vehicle (TR. 47). Manzo was unable to identify Valencia, but knew him by the nickname "Moreno" (TR. 46-47, 69). Manzo stated Valencia was her boyfriend for the last month or so (TR. 46-47, 69). Manzo stated they traveled by train from California to Grand Island, Nebraska, where they visited Valencia's family for a couple of days and then were to continue on to Chicago by car (TR. 47). Manzo told Deputy Siebken Valencia did not speek English well, neither of them were employed, and she had never been to Nebraska before (TR. 48-49). Deputy Siebken noticed the vehicle registration listed the vehicle belonged to Jesus Solis who he thought must be a male and who was not present (TR. 62-63; Ex. 3). The name on the registration appeared to be inconsistent with Manzo's response of the owner being

Valencia's aunt, which concerned Deputy Siebken based on his experience and training (TR. 62-63; Ex. 3). Deputy Siebken did not receive any reports indicating the vehicle was stolen or unlawfully possessed (TR. 65).

Deputy Siebken radioed in the identification documents to the dispatcher (TR. 51). Deputy Siebken walked back to the Ford Taurus to return Valencia's driver's license to him and tried to ask Valencia a question but was unable to get a response due to a language barrier (TR. 52). When Deputy Siebken returned to his cruiser, the dispatcher informed him Manzo's driver's license was suspended (TR. 53-54). Manzo said she believed she took care of her driver's license issue before she left for Nebraska (TR. 54). Deputy Siebken gave Manzo the identification documents and a written warning, and requested Valencia drive instead (TR. 56). The duration of the traffic stop was 29 minutes (Ex.1). After Deputy Siebken told Manzo she was "good to go," Deputy Siebken asked Manzo if he could speak with her a little more and Manzo responded "yes" (TR 56; Ex. 1 - 29:28).

As Manzo remained in the front passenger seat of Deputy Siebken's cruiser, Deputy Siebken asked if Manzo was carrying any large amounts of currency, marijuana, methamphetamine, cocaine, or heroin in which Manzo answered "no" (TR. 57, 60). When Deputy Siebken sought Manzo's consent to search the vehicle, the following exchange took place.

| | |
|---|---|
| Deputy Siebken: | Do you mind if I search the vehicle? |
| **Manzo:** | **Yeah.** |
| Deputy Siebken: | Okay. So you're giving me consent to search the vehicle? |
| **Manzo:** | **Yes.** |

Ex. 1 - 29:52 to 29:58.

Deputy Siebken testified Manzo's demeanor did not change during or after the verbal exchanges (TR. 59). Deputy Siebken described Manzo as very cooperative and did not appear to be nervous or feel threatened (TR. 59). Based on this conversation, Deputy Siebken understood Manzo was granting consent to search the vehicle (TR. 57, 64). Deputy Siebken then informed Deputy Gray, who arrived during the traffic stop, Manzo had consented to the search of the vehicle (TR. 57, 80-81).

3

Deputy Siebken approached the vehicle and ordered Valencia to get out of the vehicle (TR. 82).  Deputy Gray testified he spoke to Valencia in Spanish and asked Valencia if Valencia had any weapons (TR. 82).  Deputy Gray testified he asked Valencia permission to search Valencia's person and Valencia submitted to the search (TR. 82).  After the search of Valencia's person, for officer safety and due to cold weather conditions, Deputy Gray placed Valencia in the front passenger seat of Deputy Gray's cruiser, which was located behind Deputy Siebken's cruiser (TR. 62, 82).  Neither deputy asked Valencia for consent to search the vehicle during the stop (TR. 71).  Neither Manzo nor Valencia were in handcuffs while seated in the cruisers during the stop or search (TR. 60, 83).

After Valencia was placed in Deputy Gray's cruiser, the deputies commenced the search (TR. 60, 83).  Deputy Siebken noticed tooling marks on the doors and was unable to roll down the rear passenger-side window (TR. 60-61).  Deputies Siebken and Gray spent approximately twenty-five to thirty minutes conducting the search before they removed the rear passenger-side door panel revealing several containers (TR. 60-61).  These containers were later determined to contain packages of methamphetamine (TR. 64).  After the drugs were discovered, Deputy Gray returned to his cruiser, placed Valencia in handcuffs, and then advised Valencia, in Spanish, he was not under arrest but to remain seated in the cruiser (TR. 84).  After placing Valencia back in the cruiser, Deputy Gray returned to the vehicle with Deputy Siebken to secure the containers (TR. 85).  Deputy Siebken departed from the scene with Manzo and the containers (TR. 81, 85).  Deputy Gray waited for the tow truck to arrive before transporting Valencia to the detention center (TR. 85).  Once the tow truck arrived, Deputy Gray transported Valencia to the detention center (TR. 85).  After arriving at the detention center Deputy Gray informed Valencia he was under arrest for drugs (TR. 85).  The following afternoon, Valencia was advised of his Miranda rights and provided a statement to the officers (AR. 62).

Valencia identified the owner of the vehicle as William and William gave permission to Valencia to use the vehicle (AR. 11).  Valencia could not remember William's other name, where William lived, and only saw William one time before in Mexico, approximately one year ago (TR. 11, 14, 17).  Valencia testified Manzo was going to drive part of the night and he would drive the rest of the way to Chicago (TR. 12).  Valencia testified he was

responsible for the vehicle because William told Valencia that Valencia could use the vehicle (TR. 12). Valencia testified he asked the deputies during the stop why he was being arrested and neither of the deputies responded or spoke to him at all until the following day (TR. 19-20).

## CONCLUSIONS OF LAW

Valencia argues there was no probable cause for the traffic stop, the detention was unreasonable, and he was the only proper party to give a consent for the vehicle search. Valencia argues since the vehicle was specifically loaned to him, he had a possessory interest in the vehicle over Manzo and therefore he should have been the one to give consent to the deputies vehicle search. Valencia seeks to suppress evidence and statements stemming from the traffic stop on December 14, 2011. The government argues probable cause did exist to conduct the traffic stop, Valencia was not unreasonably detained, and the search of the vehicle did not violate Valencia's constitutional rights.

**A.   Standing**

To establish a Fourth Amendment violation, a person must demonstrate a reasonable expectation of privacy in the area to be searched. *United States v. Marquez*, 605 F.3d 604, 609 (8th Cir. 2010). "Fourth Amendment rights are personal and may not be vicariously asserted." *United States v. Randolph*, 628 F.3d 1022, 1026 (8th Cir. 2011). A defendant lacks standing to challenge a search of a place or area where the defendant has an insufficiently close connection. *Marquez*, 605 F.3d at 609; **see** *United States v. Barragan*, 379 F.3d 524, 530 (8th Cir. 2004) (holding that a "mere passenger" found in the back seat does not have a legitimate expectation of privacy and thus lacks standing to challenge the search of the vehicle). A mere passenger in a vehicle with no legitimate expectation of privacy where contraband is found may not challenge the search of the vehicle. *United States v. Crippen*, 627 F.3d 1056, 1063 (8th Cir. 2010). The passenger in a vehicle may challenge the legality of a stop and argue suppression of evidence as the fruit of illegal activity.

The vehicle registration provided to Deputy Siebken at the time of the traffic stop listed the owner as "Solis, Jesus, William" of Grand Island, Nebraska (Ex. 3; TR. 41-42). Valencia testified he obtained the vehicle in Grand Island, Nebraska, prior to the traffic stop and he had the permission of "William" to drive the vehicle to Chicago (TR. 11). As such, Valencia asserts he was the bailee of the vehicle on December 14, 2011, and possessed a legitimate expectation of privacy in the vehicle under the Fourth Amendment. **See** *Rakas v. Illinois*, 439 U.S. 128, 143-44 n.12 (1978). Valencia's testimony was not rebutted by the government.

The court finds Valencia has established he has standing under the Fourth Amendment to contest the search of the vehicle. **See** *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).

**B.     Traffic Stop**

An officer has probable cause to initiate a traffic stop when the officer observes a traffic violation, even a minor violation. *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011); **see** *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008); (**citing** *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). While conducting a traffic stop, an officer may detain the occupants in the vehicle while the officer completes a number of routine tasks which include asking for driver's license, registration, the occupants travel itinerary, route, and purpose, and writing up a citation or warning. *United States v. Bowman*, 660 F.3d 338, 343 (8th Cir. 2011). "A constitutionally permissible traffic stop can become unlawful, however, 'if it is prolonged beyond the time reasonably required to complete' its purpose." *United States v. Shafer*, 608 F.3d 1056, 1062 (8th Cir. 2010) (**quoting** *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Once the initial investigation is complete, the purpose of the traffic stop is finished and further detention of the vehicle's occupants would be unreasonable unless something occurred during the traffic stop generating a reasonable suspicion to justify further detention or unless the encounter continues to be consensual. *United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010). "If a reasonable person does feel free to terminate an encounter with an officer, then he

or she has not been seized." *United States v. Lopez-Mendoza*, 601 F.3d 861, 866 (8th Cir. 2010) (**quoting** *United States v. Carpenter*, 462 F.3d 981, 985 (8th Cir. 2006)).

Deputy Siebken reasonably believed and determined the vehicle was exceeding the speed limit with the use of radar (TR. 38-39). The vehicle's excessive speed provided Deputy Siebken probable cause to commence the traffic stop. While running radio checks on Manzo and Valencia, Deputy Siebken lawfully asked Manzo a series of routine questions about the vehicle registration, Manzo and Valencia's driver's licenses, and their travel itinerary. The duration of the traffic stop was 29 minutes (Ex. 1). The length of the traffic stop was a reasonably necessary amount of time for Deputy Siebken to complete the purpose of the stop. There is no evidence Deputy Siebken unreasonably delayed Manzo or Valencia. The court finds Deputy Siebken reasonably conducted both the traffic stop and detention.

**C.   Vehicle Search**

"While the Fourth Amendment does not permit warrantless searches, law enforcement may conduct such a search if they obtain a . . . voluntary consent." *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011). "The government has the burden of proving voluntary consent by a preponderance of the evidence and must show that on the totality of the circumstances the officer reasonably believed that the search was consensual." *Lopez-Mendoza*, 601 F.3d at 866. "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008). Accordingly, consent to search an automobile may arise from a third party's actual or apparent authority to consent. *United States v. Chavez Loya*, 528 F.3d 546, 555 (8th Cir. 2008). When an officer reasonably relies on the consent of a third party who demonstrates apparent authority the consent is lawful. *Munoz*, 590 F.3d at 922. The driver of the vehicle is the person with immediate possession and control, which gives the driver the authority to consent to a search of the vehicle. *United States v. Vargas-Miranda*, 559 F. Supp. 2d 1016, 1027 (D. Neb. 2008) (**aff'd sub nom** *United States v. Lopez-Mendoza*, 601 F.3d 861 (8th Cir. 2010)); **see** *United States v. Eldridge*,

984 F.2d 943, 948 (8th Cir. 1993). Further, the driver may consent to a full search of the vehicle even when another person who also has control of the vehicle is present, but remains silent to the driver's consent and does not object to the search. *Vargas-Miranda*, 559 F. Supp. 2d at 1027. The court considers the environment and characteristics of the person consenting when assessing the officer's belief as reasonable. *Lopez-Mendoza*, 601 F.3d at 866.

After the purpose of the traffic stop was fulfilled, the consensual encounter began when Deputy Siebken asked Manzo, "Wait, before you go, can I talk to you a little bit more?" (Ex. 1 - 29:30). Mazno replied "Yeah," then remained in the front passenger seat of Deputy Siebken's cruiser (Ex. 1 - 29:32). Deputy Siebken asked Manzo for consent to search the vehicle and Manzo consented (TR. 64; Ex. 1 - 29:52). As the driver, Manzo was in immediate possession and control of the vehicle giving her apparent authority to give consent. Deputy Siebken reasonably believed Manzo's authority over the vehicle made her a proper party to consent to the search. Valencia would have also been a proper party to give consent based on the vehicle's owner's permission for Valencia to use the vehicle. However, Manzo stated Valencia was loaned the vehicle by his aunt, yet the registration was in the name of a male. Since the driver of the vehicle gave her consent to search neither of the deputies requested Valencia's consent to the search of the vehicle. Instead, Deputy Siebken reasonably commenced the search after obtaining Manzo's valid consent. There is no evidence Valencia objected to the search or attempted to stop the deputies from searching.

The search of the vehicle was performed after the person with apparent authority gave a voluntary consent. The officers were not required to conduct further inquiry as to the ownership or possession of the vehicle and could rely reasonably upon Manzo's consent. The motion to suppress should be denied.

**IT IS RECOMMENDED TO CHIEF JUDGE LAURIE SMITH CAMP that:**

Jony Valencia's Motion to Suppress Evidence and Statements (Filing No. 41) be denied.

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 29th day of June, 2012.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.